IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| **Richard Eggers,** individually and on behalf of a putative class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>**Wells Fargo Bank, N.A.**,<br><br>Defendant. | **Case No. 4:14-cv-394**<br><br>**Defendant Wells Fargo Bank, N.A.'s Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment** |

Defendant Wells Fargo Bank, N.A. ("*Defendant*" or "*Wells Fargo*"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, submits its Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment.

The term "*App.*" below refers to the Appendix that Wells Fargo contemporaneously is filing as part of its Motion for Summary Judgment papers pursuant to Local Rule 56(e), with references to the specific pages in that Appendix as required by that same local rule.  Use of the term "*Ex.*" below refers to the lettered exhibits included in the Appendix pursuant to Local Rule 56(e), and includes a reference to the first page of the Appendix where the document begins.

Citations to documents using the prefix "*PL*" relate to records Plaintiff Richard Eggers ("*Plaintiff*" or "*Eggers*") produced in discovery or records that were produced by the plaintiffs in *Williams, et al. v. Wells Fargo Bank, N.A.*, Case No. 4:15-cv-038, and designated as usable in this case pursuant to the protective orders entered in each case on June 15, 2015.  Citations to documents using the prefix "*WF*" relate to records Wells Fargo produced in discovery.

1

Wells Fargo admits the following facts for the purpose of this motion for summary judgment only, and asserts the facts set forth below were derived by viewing the record in the light most favorable to Plaintiff and giving him all reasonable inferences, as the Rules require.

### A.   *Wells Fargo*

1.      Wells Fargo is a national bank chartered under the National Banking Act and regulated by the Office of the Comptroller of the Currency ("*OCC*") with deposits insured by the Federal Deposit Insurance Corporation ("*FDIC*").  *See* Amended Petition and Jury Demand, Docket No. 42 at ¶ 8, Ex. 1, App. 2; Wells Fargo & Company SEC Form 10-K, for fiscal year ending December 31, 2012, Ex. 2, App. 20.

2.      Wells Fargo provides retail, commercial and corporate banking services through banking stores and offices, the internet and other distribution channels to individuals, businesses and institutions in all 50 states and the District of Columbia.  *See* Ex. 2, App. 19.

3.      Wells Fargo Home Mortgage (*"WFHM"*) operated as a division of Wells Fargo at the times material to this lawsuit.  The WFHM line of business included mortgage origination and servicing.  Declaration of Peter DeLanoit, dated January 28, 2016, at ¶ 3, Ex. 3, App. 37.

### B.   *Section 19 and the Regulatory Environment Affecting Wells Fargo*

4.      Wells Fargo's banking operations are subject to regulation and examination by the OCC and the FDIC as well as by the Federal Reserve Board ("*FRB*"), the Consumer Financial Protection Bureau ("*CFPB*"), the Securities and Exchange Commission and the Commodities Futures Trading Commission.  *See* Ex. 2, App. 20-26.

5.      Wells Fargo understands that among other things the FDIC may terminate a depository institution's insurance upon a finding that it violated any applicable rule, regulation, order, or condition.  *See* Ex. 2, App. 25.

6.      As an FDIC-insured depository institution, Wells Fargo seeks at all times to comply with 12 U.S.C. § 1829, as amended by the Financial Institutions Reform, Recovery and Enforcement Act ("*Section 19*").  *See* Wells Fargo Team Member Handbook, July 2012, Ex. 4, App. 40-45.

7.      In 1998, the FDIC Board of Directors adopted and published its Statement of Policy regarding application of Section 19 in the Federal Register ("*Statement of Policy*"), it clarified the Statement of Policy in its August 8, 2011 Financial Institution Letter, modified the Statement of Policy on December 18, 2012, and it issued further clarification in a February 8, 2013 Financial Institution Letter.  FDIC Statement of Policy, December 1, 1998, Ex. 5, App. 46-54; Financial Institution Letter FIL-57-2011, August 8, 2011, Ex. 6, App. 56; Modifications to Statement of Policy for Section 19 of the Federal Deposit Insurance Act, December 18, 2012, Ex. 7, App. 60-64; Financial Institution Letter FIL-3-2013, February 8, 2013, Ex. 6, App. 51-53.

8.      While a person convicted of any crime covered by Section 19 and its related regulations must obtain consent from the FDIC *before* beginning work at an insured depository institution, *see* 12 U.S.C. § 1829, the agency can grant or deny an application for a Section 19 waiver in its discretion.  The FDIC has indicated it will not grant a Section 19 waiver unless and until the agency determines the applicant has demonstrated good cause and does not pose a risk to the bank's safety or public confidence in the bank for which the applicant seeks to work.  *See* Ex. 5, App. 53-54; FDIC Section 19 Application, Ex. 40, App. 225-27.

9.      The FDIC states it "cannot finalize its consideration of a Section 19 waiver application until all necessary information and background checks have been received and reviewed.  Background checks from certain law enforcement agencies can take several months

and, until recently, the waiting time for these background checks was responsible for most of the processing time for a typical Section 19 application." Ex. 14, App. 94.

10.     According to the FDIC, Section 19 requires insured institutions "to make a reasonable inquiry regarding an applicant's history, which consists of taking steps appropriate under the circumstances, consistent with applicable law, to avoid hiring or permitting participation in its affairs by a person who has a conviction or program entry for a covered offense." Ex. 5, App. 53.

11.     Further, "[t]he FDIC believes that at a minimum, each insured institution should establish a screening process that provides the insured institution with information concerning any convictions or program entry pertaining to a job applicant.  This would include, for example, the completion of a written employment application that requires a listing of all convictions and program entries. The FDIC will look to the circumstances of each situation to determine whether the inquiry is reasonable." Ex. 5, App. 53; *see also* Ex. 6, App. 59.

12.     The FDIC advises its insured institutions that Section 19 "applies, by operation of law, as a statutory bar to participation absent the written consent of the FDIC." Ex. 5, App. 53.

13.     Because Wells Fargo's employees, which it refers to as "Team Members," are governed by and must meet the requirements of Section 19, Wells Fargo expects they will comply and tells them of this expectation through its employee handbook sections on breach of trust or dishonesty, employment ineligibility, and background checks.  *See* Wells Fargo Team Member Handbook, January 2012, Ex. 12, App. 87-89.

14.     For example, the Wells Fargo January 2012 Team Member Handbook stated,

Background Checks

Background checks are important to protect Wells Fargo's team members and its assets and to comply with federal regulations that prohibit us from employing or associating with someone convicted of certain crimes involving dishonesty or

4

breach of trust (see Breach of Trust or Dishonesty).  Because of this, it is Wells Fargo's policy that new hires and rehires may not begin work as a team member until the background screening process has been successfully completed.

We conduct a criminal background investigation on each person who is offered a job at Wells Fargo, including those who may be rehires.  We may also investigate the employment and education background of any team member.  We reserve the right to deny or terminate employment based on the results of the check.  To ensure compliance with regulatory requirements and to ensure appropriate oversight of certain fiduciary responsibilities, Wells Fargo requires team members who are in certain positions to be rescreened periodically.  Managers of team members in these positions will be notified of the need to rescreen.  Incumbents in these positions will be notified of this requirement and are expected to fully comply and cooperate with the process of rescreening.  Failure to do so could result in corrective action, which may include termination of employment.

Ex. 12, App. 87.

15.     The handbook further stated:

Breach of Trust or Dishonesty

Because Wells Fargo is federally insured — and because we have an obligation to the customers who trust us with their financial and personal information — we won't hire or continue to employ anyone who fails to meet certain specific criteria regarding trust and honesty.

FIRREA

The Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) amended section 19 of the Federal Deposit Insurance Act to prohibit a national bank and its affiliates from employing anyone who has been convicted of certain criminal acts of dishonesty, breach of trust, money laundering, or drug trafficking or manufacturing.  This law also applies when an individual has participated in a court-authorized diversion program in connection with such an act even if the charges are ultimately suspended or dismissed.

Ex. 12, App. 88.

16.     The handbook lastly stated:

Not employable

Any individual who doesn't meet the FIRREA criteria, isn't bondable, or otherwise doesn't meet our background screening requirements cannot be employed or continue to be employed at Wells Fargo.  See Involuntary Termination.

5

Ex. 12, App. 88.

17.    Wells Fargo also tells applicants they must comply with various laws such as Section 19 and will be subject to background checks intended to aid in compliance with those laws.  Richard Eggers Job Application, dated April 7, 2005, Ex. 9, App. 74; Richard Eggers Offer Letter, signed April 7, 2005, Ex. 10, App.76-77.

18.    While an insured depository institution could seek or sponsor a waiver on behalf of a disqualified individual, Section 19 does not require it to do so and otherwise permits individuals to file their own application for consent.  Ex. 7, App. 62-64; Richard Eggers Section 19 Waiver Application, Ex. 40, App. 223-252.

19.    Wells Fargo does not seek or sponsor any individual person's Section 19 waiver application.  *See* Declaration of Deb Mitchell, Ex. 35 at ¶ 29, App. 211; Talking Points for use with Managers and Team Members regarding Background Check Process, Ex. 13, App. 90.

20.    Wells Fargo is not alone in declining to sponsor Section 19 waiver applications to the FDIC.  In a letter from FDIC acting chairman Martin J. Gruenberg to U.S. Senator Charles Grassley responding to his inquiry about Eggers, the agency's head wrote that in adopting the Statement of Policy, "the FDIC acknowledged that many institutions were not willing to file applications on behalf of a convicted individual under any circumstance."  M. Gruenberg Letter to Hon. C. Grassley, October 5, 2012, Ex. 14, App. 93.

21.    Wells Fargo's position was "[t]he application for a waiver would need to be pursued by the team member on his\her own as Wells Fargo does not apply for waivers on a person's behalf."  Ex. 13, App. 90.

22.    Wells Fargo's guidance to Employee Relations Consultants was that team members with questions regarding the Section 19 waiver process can contact the FDIC.  Ex. 35, App. 211.

C.    *Richard Eggers*

23.    Richard Eggers was born in 1944.  Ex. 1, App. 6.

24.    On February 2, 1963, Richard Eggers was convicted for the offense of fraud under the Iowa criminal code then in effect and served two days in jail in the State of Iowa. Plaintiff's Admission Responses, Ex. 15, App. 95; Eggers' FDIC Section 19 Waiver and Approval Letter, Ex. 17, App. 125, Ex. 1, App. 6; Warren County Sheriff Letter Regarding Eggers' Criminal Record, dated April 3, 1964, Ex. 18, App. 128.

25.    At age 61, Eggers began working for Wells Fargo in 2005 as a Customer Service Representative.  *See* Ex. 1, App. 6.

26.    Eggers did not disclose his fraud conviction to Wells Fargo at the time he was hired.  Ex. 9, App. 73; Ex. 15, App. 96.

27.    To the contrary, when Eggers completed and submitted a job application form to Wells Fargo prior to being hired in 2005, he responded "No" to the question "Have you ever been convicted of any crime involving dishonesty or breach of trust such as theft or falsification?"  Ex. 9, App. 73; Ex. 15, App. 6.

28.    Additionally, when Eggers signed and accepted a contingent job offer from Wells Fargo on April 7, 2005, he agreed:

> a.    "As a federally insured institution, Wells Fargo is unable to employ individuals who have been convicted of or participated in a pre-trial diversion program with respect to, a crime of dishonesty or breach of trust and/or any person who does not meet our bond requirements."

        b.  His employment was at-will and either Eggers or Wells Fargo had the right to terminate his employment "at any time, with or without advance notice and with or without cause."

Ex. 10, App. 76-77.

29.     On April 7, 2005, Eggers also signed a Team Member Acknowledgement indicating he had been advised about the Handbook for Wells Fargo Team Members, its availability to him in hard copy and/or online forms, and its applicability to him then and in the future.  Eggers' Team Member Handbook Acknowledgement, Ex. 19, App. 129.

30.     The 2005 Wells Fargo Team Member Handbook stated the following with respect to Section 19:  "Background checks are important to protect Wells Fargo's team members and its assets, as well as to comply with federal regulations that prohibit us from employing or associating with someone convicted of certain crimes involving dishonesty or breach of trust."  2005 Wells Fargo Team Member Handbook, Ex. 20, App. 132.

31.     That 2005 handbook also advised Eggers "Any individual who doesn't meet the FIRREA criteria, isn't bondable, or otherwise doesn't meet our criminal background screening requirements cannot be employed or continue employment at Wells Fargo."  Ex. 20, App. 133.

32.     In connection with its hiring of Eggers, Wells Fargo relied on its vendor at the time to complete a name-based criminal records background check for him using the name Richard Eggers, his birth date, and his Social Security number.  That check indicated records were available to be searched from 1998 to the present in the locations that were searched.  Ex. 11, App. 78-85.

33.     Name-based criminal background checks were part of Wells Fargo's practice of screening for Section 19 eligibility prior to hire.  Ex. 20, App. 132; Ex. 35, App. 208.

34.     Because that search indicated he had no criminal record and he did not disclose any crimes of dishonesty or breach of trust on his job application form, Wells Fargo proceeded to employ Eggers on an at-will basis as indicated in his offer letter.  Ex. 11, App. 78-85; Ex. 9, App. 73; Ex. 10, App. 76-77.

35.     As part of the forms Eggers executed to permit First Advantage to conduct a background check on him in 2012, he responded "No" to the question "Have you ever been convicted of any crime involving dishonesty; breach of trust; fraud, theft; money laundering; or illegal manufacture, sale, distribution of or trafficking in controlled substances."  Eggers' Background Screening Authorization, Ex. 22, App. 137-38; Ex. 15, App. 96.

36.     Eggers' 1963 fraud conviction was not discernable from a name-based background check of Warren County, Iowa court records because "records in the district [sic] court and district attorney's office do not date back to 1963."  Eggers' First Advantage Security Screening, Ex. 21, App. 135.

37.     Fingerprint-based background check information obtained by First Advantage in the 2012 rescreen described below disclosed to Wells Fargo for the first time that Eggers had a prior fraud conviction that rendered him eligible to work for a federally-insured depository institution such as Wells Fargo by operation of Section 19.  Eggers' 2012 FBI Fingerprint-Based Background Check Results, Ex. 23, App. 141.

38.     Between his February 2, 1963 criminal conviction for fraud and his discharge from employment by Wells Fargo on July 12, 2012, Eggers did not seek and did not hold consent from the Federal Deposit Insurance Corporation to work for a federally insured depository institution.  Ex. 15, App. 95.

39.     Instead, Plaintiff first applied for an FDIC Section 19 waiver in August 2012, one

month after Wells Fargo discharged him for Section 19 ineligibility.  Ex. 15, App. 96-97; Ex. 40,

App. 223-252.

**D.      *The 2008 Economic Collapse and Changes in the Federal Banking Regulatory Climate that Followed***

40.     In 2008, the United States experienced a significant economic downturn as part of

a global financial crisis and recession.  Some of America's larger financial institutions were

imperiled, including mortgage companies such as Countrywide Financial, savings banks such as

Washington Mutual, banks such as Wachovia, and Wall Street companies such as Lehman

Brothers and Bear Stearns.  *See* M. Baily, W. Bekker, and S. Holmes, *The Four Big Banks:  The

Evolution of the Financial Section, Part I*, The Brookings Institution (May 2015), Ex. 24, App.

142-53.

41.     The federal government also looked to stronger financial institutions such as

Wells Fargo to assume the businesses, operations, and employees of failing institutions and in

this climate, Wells Fargo agreed to acquire Wachovia.  *See, e.g.*, Ex. 24, App. 143.

42.     As part of the recovery efforts made in the wake of the financial crisis of 2008,

the federal government significantly increased its regulation of U.S. financial services companies

by implementing regulatory oversight initiatives that substantially changed how most those

financial services companies conducted business.  For example, in 2010, Congress passed and

President Barack Obama signed the Dodd-Frank Wall Street Reform and Consumer Protection

Act, a statute that "spans over 2,300 pages and affects almost every aspect of the U.S. financial

services industry."  W. Sweet, Harvard Law School Program on Corporate Governance, *Dodd-

Frank Act Becomes Law*, July 21, 2010, Ex. 25, App. 155.

43.     "The objectives ascribed to the [Dodd –Frank] Act by its proponents in Congress and by the President include restoring public confidence in the financial system, preventing another financial crisis, and allowing any future asset bubble to be detected and deflated before another financial crisis ensues."  Ex. 25, App. 155.

44.     The Secure and Fair Enforcement for Mortgage Licensing Act of 2008, 12 U.S.C. § 5101, *et. seq*, (the "*SAFE Act*") and its rules that became effective on October 1, 2010, changed how mortgage origination could be conducted by businesses such as Wells Fargo and imposed requirements that loan origination personnel must obtain a federal registration to conduct business.  *See* OCC's Office of Thrift Supervision Memorandum, dated July 28, 2010, Ex. 26, App. 158.

45.     The SAFE Act, 12 U.S.C. § 5104(b)(2), and Regulation G adopted pursuant to it further imposed employment eligibility requirements parallel and in addition to those of Section mandate that all mortgage loan originators disclose as part of the registration process "[c]riminal convictions involving dishonesty, breach of trust, or money laundering against the MLO," in order to "enhance consumer protection."  *See* CFPB Memorandum *Disciplinary Action Functionality added to the Nationwide Mortgage Licensing System and Registry*, dated October 12, 2012, Ex. 27, App. 160.

46.     The FDIC has taken the position that the SAFE Act further requires persons seeking to work as mortgage loan originators at the FDIC-insured institutions that employed them to provide information to the national registry clearinghouse (the Nationwide Mortgage Licensing System and Registry), including fingerprints, so that a fingerprint-based criminal background check could be completed as part of the registration process.  *See* FDIC Financial

Institution Letter, *Notice of Joint Final Rule: Registration of Residential Mortgage Loan Originators*, FIL-43-2010, dated July 30, 2010, Ex. 6, App. 55.

47.     On September 23, 2011, the United States Department of Housing and Urban Development issued guidance, effective immediately, that lenders or mortgagees such as Wells Fargo needed to meet and continue to meet to proceed as FHA approved lenders.  Those requirements imposed disclosure obligations if a manager, supervisor, loan processor, loan underwriter, loan originator, or officer "has been indicted for, or convicted of, an offense that reflects adversely upon the integrity, competency, or fitness to meet the responsibilities of the lender or mortgagee to participate in the Title I or Title II programs" or had a felony related to participation in the real estate or mortgage loan industry "at any time preceding such date of application, if such felony involved an act of fraud, dishonesty, or breach of trust, or money laundering. . . ."  FHA Revised Lender Approval Requirements, Mortgagee Letter 2011-34 (September 23, 2011), Ex. 8, App. 67-68.

**E.     *Wells Fargo Completes the Wachovia Acquisition and Works to Conform Its Background Check Procedures***

48.     Wells Fargo completed its acquisition of Wachovia on December 31, 2008.  Wells Fargo & Company Annual Report 2008, Ex. 28, App. 166.

49.     At that time, Wachovia had been utilizing fingerprint-based criminal background screenings.  Ex. 35 at ¶ 7, App. 209.

50.     Prior to mid-March 2010, Wells Fargo's Section 19 background screening process did not involve conducting FBI fingerprint-based background screenings.  Ex. 35, App. 208.

51.     Prior to mid-March 2010, the Wells Fargo screening process involved a name-based search of criminal background check records through a third-party vendor.  Ex. 35, App. 208.

52.     The name-based criminal records searches conducted prior to mid-March 2010 were less robust than the database maintained by the FBI and many older or non-public conviction records would not be revealed using only a name-based background screening process.  Ex. 35, App. 208-09.

53.     In approximately 2010, Wells Fargo engaged First Advantage as its background check vendor.  Ex. 35, App. 209.

54.     By early 2010, Wells Fargo required all persons receiving contingent offers of employment to complete and pass FBI fingerprint-based criminal background screenings prior to beginning employment.  Executive Summary for HR Teams, WFHM Background Check Project, Notes from November 28, 2011 Update Meeting, Ex. 32, App. 185.

55.     In this same time frame, some WFHM sales team members (for example, mortgage loan originators) were newly required to be fingerprinted and rescreened as a part of new SAFE Act requirements.  Ex. 30, App. 176.

56.     WFHM reviewed its criminal background screening procedures in 2009 and 2010 regarding current team members in light of new regulatory requirements, such as the SAFE Act and new FHA guidance, and the use and availability of FBI fingerprint-based background screenings.  Ex. 3, at ¶ 5, App. 37; *see also* Ex. 8, App. 65-69.

57.     WFHM determined that because a significant portion of its team members would be impacted by SAFE registration and additional screenings for purposes of compliance with other programs such as those administered by the Veterans Administration or the Federal Housing Administration, it was a prudent business practice to rescreen all team members within the WFHM line of business involving loan origination, processing, or servicing whether or not the individual team member would be a registered mortgage loan originator subject the SAFE

Act.  *See* Ex. 30, App. 176; *see also* Communications Plan, November 4, 2011, Ex. 31, App.

179-83; WFHM HR Background Checks Project, WFHM Manager Meetings Presentation,

November 2011, Ex. 32, App. 184-92; Ex. 3, at ¶ 8, App. 38.

58.     Therefore, in late 2011 and 2012, a two-phase rescreen project was implemented

in which WFHM team members would undergo a rescreening of their criminal history, including

an FBI fingerprint-based search.  *See* Ex. 30, App. 176.

59.     WFHM announced the rescreen and communicated the decision to team members

explaining why the rescreen project was being undertaken and the need for fingerprinting and

updated background checks.  Ex. 3, at ¶ 7, App. 38; Reminder-Action Required:  Fingerprinting

and Background Checks Begin Email, December 28, 2011, Ex. 33, App. 193-94.

60.     In addition, WFHM made the business judgment that "[t]his consistent approach

to background checks also will allow us to better manage resources, enabling team members to

more easily move into different areas of the business regardless of product type and the various

regulatory requirements that govern those products."  Ex. 32, App. 186; Ex. 3, App. 38.

61.     Wells Fargo was not alone in increasing its compliance efforts around this time.

In a November 2012 report from the Executive Director of the FDIC that its acting general

counsel signed in concurrence, the agency explained why it was experiencing a surge in Section

19 waiver applications:

> The increase in applications largely resulted from two factors.  First, recent
> mergers of entities, such as investment firms, into banks have made Section 19
> applicable to employees not previously covered.  Second the Secure and Fair
> Enforcement for Mortgage Act of 2008 requires insured institutions to perform
> checks on all mortgage loan originators.  Some insured institutions, after
> performing the new required background checks, recognized deficiencies in their
> background check process, and performed new background checks on *all*
> employees.

FDIC Report, *Modifications to the Statement of Policy for Section 19 of the Federal Deposit Insurance (FDI) Act*, November 26, 2012 (emphasis in original), Ex. 34, App. 196.

**F.    *WFHM Conducts Team Member Background Check Rescreening***

62.    The first phase of the rescreen project began in December 2011 and a second phase began in approximately March 2012.  Ex. 32, App. 186.

63.    In general, the rescreen process began with email communications from Wells Fargo to both the manager and the team member in advance of emails being sent to the team member by Wells Fargo's third-party background check vendor, First Advantage.  Ex. 31, App. 180.

64.    The team member then completed an information form and a consent form and chose a location to be fingerprinted.  Ex. 31, App. 180-81; Eggers Background Check Application Form, April 13, 2012, Ex. 22, App. 137-38.

65.    After securing fingerprints from the team member, First Advantage obtained criminal conviction records, generated a criminal background report, and obtained the FBI's criminal history information.  *See* Ex. 21, App. 134-36; *see also* Ex. 23, App. 139-41.

66.    When Wells Fargo received a WFHM team member's criminal background rescreen information from First Advantage, it undertook an individualized review for any team member who was flagged as possibly ineligible for employment under Section 19.  *See* Ex. 35 at ¶ 9, App. 209.

67.    The individualized review for each WFHM team member who was flagged as possibly disqualified in the rescreen involved applying objective Section 19 eligibility criteria and produced case-by-case decisions that determined whether the person's criminal history

record information triggered the statutory disqualification of 12 U.S.C. § 1829.  Ex. 35 at ¶ 10, App. 209.

68.    First, a member of Wells Fargo's Background Screening Compliance Team ("*BSCT*") reviewed the results for each WFHM team member who was flagged as possibly disqualified in the rescreen, processed the case, and made a preliminary determination of eligibility.  *See* Ex. 35 at ¶ 11, App. 209.

69.    During these initial reviews for regulatory eligibility under Section 19, if a disqualifying conviction was identified, the BSCT would review the FDIC *de minimis* criteria to see if the WFHM team member could otherwise satisfy all of the factors needed for an automatic FDIC exemption.  Ex. 35 at ¶ 12, App. 209.

70.    Another member of the BSCT reviewed the preliminary determination of eligibility and either agreed or disagreed with the original processor on whether, for example, the WFHM team member was not eligible due to Section 19 regulatory considerations.  *See* Ex. 35 at ¶ 13, App. 209.

71.    If as a result of this individualized review, a given WFHM team member was coded as ineligible by the final reviewer in the case management system, the record was assigned to a Corporate Employee Relations Consultant for additional case review.  Ex. 35 at ¶ 14, App. 210.

72.    After the Corporate Employee Relations Consultant conducted additional review, the record would be finalized and the correct eligibility decision was applied.  Ex. 35 at ¶ 15, App. 210.

73.    Once the review was completed and an existing WFHM team member was deemed ineligible for continued employment due to a Section 19 regulatory disqualifying record,

Corporate Employee Relations sent an email notifying a team of Employee Relations Consultants that supported the WFHM line of business regarding the team member's ineligibility.  Ex. 35 at ¶ 16, App. 210.

74.     The WFHM line of business Employee Relations Consultants then set in motion the employment termination process by communicating with the ineligible team member's direct manager.  Ex. 35 at ¶ 17, App. 210.

75.     The line of business Employee Relations Consultant prepared the manager for a termination meeting that he or she would be asked to conduct in person with the team member who was deemed ineligible for employment under Section 19.  Ex. 35 at ¶ 18, App. 210.

76.     However, the line of business Employee Relations Consultant did not disclose specifics of the negative background check results with the manager, in part, because of the sensitive nature of the information.  Ex. 35 at ¶ 19, App. 210.

77.     The team member's manager took responsibility for facilitating the termination discussion although a line of business Employee Relations Consultant may also have been involved in the discussion.  For example, a line of business Employee Relations Consultant participated in the termination meeting with Eggers.  Ex. 35 at ¶ 20, App. 210.

78.     If during the course of the termination discussion, a team member indicated that they had information to dispute the criminal conviction record, the termination would be put on hold and an Employee Relations Consultant would follow up with the team member.  Ex. 35 at ¶ 21, App. 210.

79.     Team members were also instructed to contact designated line of business Employee Relations Consultant contact with specific questions.  Ex. 35 at ¶ 22, App. 211.

80.     If after the individualized review and verification process, Wells Fargo confirmed

a WFHM team member's criminal conviction information demonstrated he or she was ineligible

for continued employment pursuant to Section 19, discharge occurred.  Ex. 35 at ¶ 24, App. 211.

G.     ***As Mandated by Section 19 Wells Fargo Terminates the Employment of
       Ineligible Team Members Upon Learning of Disqualifying Convictions through
       the Rescreening***

81.     In June 2012, WFHM sent a team member update informing team members that

the background check rescreening was nearly complete.  Background check rescreening update,

Ex. 36, App. 213-14.

82.     The rescreen process in the WFHM line of business during 2011 and 2012

involved approximately 31,769 fingerprint-based background checks.  Ex. 35 at ¶ 25, App. 211.

83.     First Advantage advised Wells Fargo of approximately 4,723 individual WFHM

team members whose background check results indicated a criminal conviction potentially

making that person ineligible for Wells Fargo employment.  Ex. 35 at ¶ 26, App. 211.

84.     Wells Fargo's BSCT independently reviewed the results of each of the

approximately 4,723 individual team members' criminal background results, embarking upon an

individualized assessment of each team member's criminal history compared to federally-

mandated Section 19 eligibility standards, including application of the FDIC's then-existing *de

minimis* criteria.  Ex. 35 at ¶ 27, App. 211.

85.     Approximately 361 of those WFHM team members rescreened were deemed

ineligible under Section 19 and discharged from employment.  Ex. 35 at ¶ 28, App. 211.

86.     The FDIC permitted ineligible persons to apply for a Section 19 waiver and if

granted, they could apply for employment with an insured depository institution such as Wells

Fargo.  Wells Fargo, however, did not sponsor such waiver applications.  Ex.  40, App. 223-52; Ex. 35 at ¶ 29, App. 211; Ex. 13, App. 90.

87.     Wells Fargo discussed with Eggers the possibility of administrative leave while he sought an FDIC waiver, but he declined such leave, and his employment was terminated on July 12, 2012, due to his Section 19 ineligibility.  Case Note, recap of conversation with TM, July 12, 2012, Ex. 37, App. 215; Eggers Termination Letter, July 12, 2012, Ex. 38, App. 216.

88.     Between the time of his 1963 conviction for fraud and his discharge from employment at Wells Fargo on July 12, 2012, Eggers had not sought, and did not hold, consent from the FDIC to work for a federally insured depository institution.  Ex. 15, App. 95.

89.     Team Member S, whose complete name is set forth in the unredacted version of App. Ex. 39, as filed under seal, was a WFHM team member like Eggers who lost her job in the WFHM rescreening and was represented at the Iowa Civil Rights Commission ("*ICRC*") by the lawyers of record in this case.  ICRC Complaint of Team Member S, Ex. 39, App. 217-22.

90.     Team Member S was 29 years of age when she was discharged for Section 19 ineligibility.  Ex. 39, App. 217.

91.     According to her complaint to the ICRC, Team Member S claimed,

Wells Fargo's criminal background check policy is discriminatory because African Americans, Hispanics, younger workers, and other protected classes of individuals are more likely to be convicted of certain types of crimes.  For example, younger employees are more likely to have arrests and convictions related to the use of fake ID's because the growth and availability of the Internet has allowed for forging methods to spread throughout college campuses.

Ex. 39, App. 221.

H.      *Eggers and Those Other Ineligible Wells Fargo Team Members Who Obtain FDIC Waivers Are Offered Re-Employment*

92.      On August 31, 2012, Eggers filed an application with the FDIC for a Section 19 waiver allowing him to work for an insured depository institution.  Ex. 15, App. 96-97; Ex. 40, App. 223-52.

93.      Eggers' application acknowledged his fraud conviction was a disqualifying offense under Section 19.  Ex. 40, App. 223-52.

94.      The FDIC exercised its discretion by granting Eggers' waiver application on September 26, 2012.  Ex. 17, App. 124-27.

95.      Once the FDIC provided its consent on September 26, 2012, Eggers became eligible to work for a federally insured depository institution such as Wells Fargo.  Ex. 17, App. 124-27; Ex. 15, App. 95.

96.      After Eggers became eligible to work for Wells Fargo and provided it with the FDIC's waiver, Wells Fargo offered Eggers employment in his prior position with the same salary.  Eggers' Re-Employment Offer Letter, October 12, 2012, Ex. 41, App. 253-55.

97.      Eggers declined the offer.   Eggers' Press Statement, October 23, 2012, Ex. 42, App. 256.

98.      Some former WFHM team members who obtained FDIC waivers sought rehire with Wells Fargo and like Eggers were given an offer of employment.  For example, Teresa Jones, one of the named plaintiffs in the companion Section 19 race discrimination cases on file in this District, accepted such an offer and returned to work at Wells Fargo.  T. Jones Offer Letter, October 22, 2012, Ex. 44, App. 265-67.

99.      Requests by ineligible former WFHM team members for FDIC waivers were part of a "surge" in Section 19 waiver applications experienced in 2012 by the FDIC, as noted in a

November 2012 agency memorandum recommending changes to the *de minimis* criteria.  *See*

Ex. 34, App. 196.

**I.** **_Eggers Cross-Files Charges of Age Discrimination with State and Federal Agencies that the Iowa Civil Rights Commission Hold are Preempted by Section 19 and That Neither Agency Choses to Prosecute_**

100.    On September 18, 2012, Eggers filed a charge of discrimination with the ICRC

and requested that it be cross-filed with the Equal Opportunity Employment Commission

("*EEOC*").  Eggers ICRC Complaint, Ex. 45, App. 268-72.

101.    Eggers' complaint relied on only two actions purportedly taken by WFHM

against him by checking the box "Terminated" and checking the box "Other" and typing in

"Pattern & Practice and Disparate Impact Discrimination."  Ex. 45, App. 268.

102.    In the subject matter questions for his complaint, Eggers alleged he was

discriminated against because of his sex, a perceived disability, and his age.  Ex. 49, App. 269.

103.    Eggers' charge of discrimination detailed the grounds for his complaint on one

single-spaced, typed page that stated in part:

> Wells Fargo fired me on July 12, 2012 because of a discriminatory background
> check policy.
>
> *   *   *
>
> Wells Fargo's criminal background check policy is discriminatory because
> African-Americans, Hispanics, older workers and other protected classes of
> individuals are more likely to be convicted of certain types of crimes.  The length
> of time between my past mistake and Wells Fargo's decision to fire me proves
> that my prior conviction is not job-related.  Thus, *Wells Fargo's criminal
> background check policy* has a disparate impact on protected classes.
>
> *   *   *
>
> I bring this claim against Wells Fargo and First Advantage Background Services
> because they implemented and conducted a discriminatory background check
> policy that resulted in the loss of my career. . . .   Additionally, I bring this claim
> against the FDIC – the entity charged with administering the law under which

these background checks have been conducted.  The law itself unconstitutionally discriminates against protected classes of individuals.

This complaint is intended to place Wells Fargo, First Advantage, and the FDIC on notice of class-wide intentional and unintentional forms of systemic discrimination affecting protected classes of applicants and employees who are adversely affected by the above-mentioned background check policy. . . .

Ex. 45, App. 272 (emphasis added).

104.    When he filed his ICRC complaint, Eggers also submitted a Contact information form disclosing that his designated contact person for the case was "Newkirk Law Firm, P.L.C., Leonard Bates."  Eggers' ICRC Contact Information Sheet, Ex. 46, App. 273.

105.    On February 25, 2013, the ICRC issued its administrative closure letter to Eggers ending its consideration of his complaint based on the Screening Data Analysis and Case Determination issued by the agency on the same date and attached to the closure letter.  The ICRC also issued its case closure form on the same date.  ICRC Administrative Closure Letter, Screening Data Analysis and Case Determination, and Case Closure Form, February 25, 2013, Ex. 47, App. 274-88.

106.    The ICRC case determination consisted of a 13-page, single-spaced typed report. It concluded that Eggers' complaint did not merit further processing and administratively closed it.  Ex. 47, App. 276-88.

107.    The ICRC case determination held, "Respondent has no discretion under Section 19 and is afforded a defense to any Title VII, ADAAA, or ADEA claim.  Based on the information collected to date, Complainant's disparate impact claim does not merit further investigation."  Ex. 47, App. 285.

108.    Following the ICRC's February 25, 2013 closure of his charge of discrimination, Eggers requested that the agency reopen and reconsider his administrative complaint.  Eggers' ICRC Request for Reconsideration, March 21, 2013, Ex. 48, App. 289-94.

109.    After completing a "thorough review" of the parties' arguments and additional information, and "considering the arguments from both sides," the ICRC Executive Director entered a formal Order and Notice Denying Reopening on June 7, 2013.  ICRC Order and Notice Denying Reopening, Ex. 49, App. 295-96.

110.    The ICRC Executive Director's Order and Notice Denying Reopening ruled that (1) "Section 19 preempts state law, including the ICRA," and (2) "the failure to provide notification of the waiver process, when not required by the Section 19 itself, does not rise to the level necessary to support a disparate impact claim."  Ex. 48, App. 295.

111.    The Order and Notice Denying Reopening further held that "the screening analysis was correct in fact and law," and "the original decision is supported in fact and law."  Ex. 48, App. 295.

112.    Eggers thereafter requested a right to sue letter from the ICRC on September 9, 2014, without seeking judicial review of the Order and Notice Denying Reopening.  Eggers Request for Right to Sue Letter, September 9, 2014, Ex. 50, App. 297.

113.    The ICRC issued Eggers a right to sue letter on September 10, 2014.  ICRC Administrative Release, Ex. 51, App. 298.

**J.**    ***Eggers and His Lawyers Seek Publicity, in Part to Persuade the FDIC to Change Its Section 19 Rules***

114.    Once Eggers lost his job, he and his lawyers embarked on a publicity campaign designed to draw attention to his case and to seek change from the FDIC.  *See, e.g.*, Eggers Press Communications, Ex. 52, App. 299-412.

115.    For example, Eggers sent an email to a *Des Moines Register* reporter on July 16, 2012, four days after his discharge, stating "Whenever I have questioned Wells Fargo Human Resources or management personnel about the reasoning behind this, I have been assured that they are simply adhering to a federal statute which requires the action.  I find this difficult to believe.  . . .  The only real reason that I can conjecture that Wells Fargo may have would be a corporate-wide program to eliminate as many of the more highly paid lower-level employees as possible, to be replaced with temps and/or part-time employees."  Ex. 52, App. 301-02.

116.    The email never mentioned age discrimination or alleged that Eggers lost his job because of his age.  It instead concentrated on Section 19.  Ex. 52, App. 301-02.

117.    Similarly, in an interview Plaintiff conducted with an the *American Free Press* for a program it disseminated on or about November 17 2012, Eggers described why he lost his job in what now certainly are statements against his interest:

> Section 19, which is the only one that's ever applied to me, basically just states that anyone with a criminal or trust background cannot be eligible to work in a financial or banking institution unless they obtain an FDIC waiver which in fact is almost always granted because most of these things are decades old and most of them are pretty trivial.  But during the meantime, it takes about 10 to 12 months to get a waiver, and the people who are let go and who are terminated go through a lot of financial problems until they can get their jobs back.

Ex. 15, App. 98; Ex. 16, App. 114.

Eggers never asserted during that *American Free Press* interview that his discharge either stemmed from or resulted in age discrimination.  Ex. 15, App. 98; Ex. 16, App. 104-23.

118.    Eggers instead stated:

> They were playing a game -- in my opinion, because Wells Fargo doesn't let out a lot of information, but in my opinion I think Wells Fargo let go of these 3,000 people simply to try to make a case with the feds that they are overregulated and to be able to say look what we have to do to all these people because you're making us be bad.

. . .

I would guess that's the reason they do it.  I know of no other reason they would
be doing it.

Ex. 15, App. 98; Ex. 16, App. 117.

119.    Eggers also engaged the press once he received his Section 19 waiver from the

FDIC, but chose not return to work when Wells Fargo offered to re-employ him.  According to

the press release Eggers and his attorneys issued, he declined to return to work because "nothing

had changed in terms of Wells Fargo's policies and procedures concerning the background

checks, which weigh heavily on lower-level employees."  Ex. 42, App. 256; Ex. 15, App. 97.

120.    Eggers' press release never mentioned age discrimination.  Ex. 42, App. 256.

121.    Eggers also sought the intervention of U.S. Senator Charles Grassley, when in a

handwritten letter dated August 29, 2012, he wrote the senior member of the Iowa Congressional

delegation and stated, "I was terminated under the provisions of Section 19 of the FDIC Act . . . .

I believe this was unfair because:  . . .  the issue was pitifully trivial."  He never mentioned that

his termination occurred because of his age or due to discrimination.  Eggers Letter to Senator

Charles Grassley, August 29, 2012, Ex. 53, App. 413-14.

122.    Within a month, on September 21, 2012, Senator Grassley co-authored a letter

with Iowa Congressman Tom Latham to the FDIC requesting that the agency provide

information on its Section 19 guidance to banks and its processing of waiver applications.  That

letter specifically noted, "Section 19 of the Federal Deposit Insurance Act (Deposit Act) of 1950

provides an important safeguard to ensure that employees within the banking system do not have

a criminal history.  In 2008, this section of the Deposit Act was expanded to include employees

in the mortgage industry."  Senator Grassley and Congressman Latham Letter to the FDIC,

September 21, 2012, Ex. 54, App. 415-16.

123.   That letter referenced Eggers' discharge and then noted, "While Section 19 of the Deposit Act *requires* a complete and thorough background check, the guidance issued to financial institutions and the construction of the waiver process *is at the discretion of the FDIC.*" Ex. 54, App. 415.

124.   In a May 28, 2015 EEOC Informal Discussion letter addressed to Plaintiff's counsel, the EEOC's assistant legal counsel wrote:

> As you know, the EEOC enforces, among other laws, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), which prohibits employment discrimination based on race, color, sex, religion, and national origin.  *Title VII does not prevent employers, including private institutions subject to Section 19, from using criminal background checks, as long as they do so without discriminating on the basis of race, national origin, or another legally-protected characteristic.*
>
> [. . .]
>
> *[O]ur records reflect that EEOC staff communicated directly with FDIC staff about Section 19, in particular.  In addition, the Enforcement Guidance specifically refers to Section 19 as an example of federal regulations that provide a mechanism for an employer to apply for a waiver of a federally-imposed occupational restriction. See Enforcement Guidance, at § VI.C.*
>
> [. . .]
>
> *We understand that your litigation on behalf of Richard Eggers has been credited with prompting the December 2012 changes to the FDIC Policy.*[3]
>
> [. . .]
>
> While we cannot comment on the specific legal theories you advance in your letter and in the pending litigation, *we can reiterate the Commission's belief that the Enforcement Guidance strikes the right balance between legitimate workplace safety issues and the imperative to eliminate discriminatory employment practices.*

*See* EEOC Informal Discussion Letter, *Title VII/Conviction Records/Federal Banking Regulations*, dated May 28, 2015, (footnotes omitted and emphasis added), Ex. 55, App. 417-19.

K.     *Summary Timeline*

125.    The following timeline, presented graphically at Ex. 56, App. 420, summarizes

the above-referenced undisputed material facts:

a.   **1963** – Richard Eggers convicted of fraud and served jail time.  SUMF ¶ 24.

b.   **2005** – Richard Eggers was hired as a Customer Service Representative.  He
     did not disclose his fraud conviction.  SUMF ¶¶ 25-26.

c.   **2008** – Wells Fargo acquired Wachovia, which already conducts fingerprint-
     based background checks as part of its Section 19 compliance.  SUMF ¶¶ 48-
     49.

d.   **July 30, 2008** – Congress enacted the SAFE Act.  Its regulations effective
     October 1, 2010, required fingerprinting as part of registration process for
     mortgage loan originators.  SUMF ¶¶ 44-46.

e.   **Early 2010** – Wells Fargo required all new hires to have FBI fingerprint-
     based criminal background screenings.  SUMF ¶ 54.

f.   **September 23, 2011** – HUD issued guidance for FHA approved lenders,
     including disclosure obligations regarding criminal actions.  SUMF ¶ 47.

g.   **Late 2011 and 2012** – WFHM implemented a rescreen project in which
     WFHM team members would undergo criminal history rescreenings including
     FBI fingerprint-based checks.  SUMF ¶ 58.

h.   **December 2011** – WFHM begins the first phase of the rescreen.  SUMF ¶ 62.

i.   **June 2012** – The WFHM rescreen is nearly completed.  SUMF ¶ 81.

j.   **July 12, 2012** – Eggers is discharged due to Section 19 ineligibility SUMF ¶
     87.

k.  **August 31, 2012** – Eggers applied for Section 19 waiver from the FDIC.
    SUMF ¶ 92.

l.  **September 18, 2012** –Eggers cross-filed administrative charges claiming age,
    sex, and disability discrimination.  SUMF ¶¶ 100.

m.  **September 26, 2012** – Eggers received the Section 19 waiver from the FDIC.
    SUMF ¶ 94.

n.  **October 12, 2012** – Wells Fargo offered to rehire Eggers and he declined to
    return to work.  SUMF ¶¶ 96-97.

o.  **February 25, 2013 -**  ICRC administratively closed Eggers' complaint.
    SUMF ¶ 105.

p.  **June 7, 2013** – After Eggers sought review of the closure of his
    discrimination complaint, the ICRC issued an Order, holding "Section 19
    preempts state law, including the ICRA," and "the failure to provide
    notification of the waiver process, when not required by the Section 19 itself,
    does not rise to the level necessary to support a disparate impact claim."
    SUMF ¶ 110.

Dated:  January 29, 2016.                    **FAEGRE BAKER DANIELS LLP**

                                             /s/ Michael A. Giudicessi
                                             Michael A. Giudicessi, *Lead Counsel*
                                               *michael.giudicessi@faegrebd.com*
                                             Britt L. Teply
                                               *britt.teply@faegrebd.com*
                                             801 Grand Avenue, 33rd Floor
                                             Des Moines, Iowa 50309-8003
                                             Telephone: (515) 248-9000
                                             Facsimile: (515) 248-9010

                                             **ATTORNEYS FOR DEFENDANT
                                             WELLS FARGO BANK, N.A.**


                        **Certificate of Service**

The undersigned hereby certifies that a true copy of the foregoing **Defendant Wells Fargo Bank, N.A.'s Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment** was served upon the Plaintiff through the Court's CM/ECF filing system on the 29th day of January, 2016.

                                             /s/ Trisha Richey

Copy to:

Thomas A. Newkirk
  *tnewkirk@newkirklaw.com*
Leonard E. Bates
  *lbates@newkirklaw.com*

*Attorneys for Plaintiff*

US.101796741.23

29